UNITED STATES of America, Appellee,

v.

Lorenzo NICHOLS, Defendant,

Howard Mason, Defendant–Appellant.

No. 381, Docket 94–1036.

United States Court of Appeals,
Second Circuit.

Argued Nov. 18, 1994.

Decided May 26, 1995.

Ivan S. Fisher, New York City, for defendant-appellant.

Leslie R. Caldwell, Asst. U.S. Atty., E.D.N.Y., Brooklyn, NY (Zachary W. Carter, U.S. Atty., and Susan Corkery, Asst. U.S. Atty., of counsel), for U.S.

Before: OAKES, ALTIMARI, and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Howard Mason appeals from a judgment of conviction and sentence entered in the United States District Court for the Eastern District of New York (Edward R. Korman, District Judge) after a jury trial. Mason argues that the district court erroneously (1) assigned him the burden to prove incompetency; (2) found him competent to stand trial in 1989 and to be sentenced in 1994; (3) permitted him to waive his right to attend trial before finding him competent to waive that right; and (4) tried him *in absentia* without securing a knowing and voluntary

waiver on the record of his right to attend trial. We affirm.

## BACKGROUND

According to the evidence adduced at trial, Howard Mason was a leader of the "Bebos" drug gang, which controlled much of the South Jamaica crack trade in Queens during the mid to late 1980's. In 1988, Mason was imprisoned on a state firearms conviction. Following his imprisonment, Mason took revenge by directing Bebos underlings to assassinate a New York City police officer. On February 25, 1988, the Bebos carrying out the order happened upon rookie police officer Edward Byrne, who was on assignment outside the home of a witness in an unrelated drug case. They shot Officer Byrne five times in the head at point-blank range, killing him.

### I. Arrest and Detention

On August 11, 1988, Mason, along with other members of the Bebos and another drug gang, was arrested on federal narcotics conspiracy charges. He was detained at the Metropolitan Correctional Center ("MCC"). At the MCC, Mason's disruptive conduct earned him disciplinary segregation. After he attacked two codefendants with a homemade weapon and started a fire in his cell because he was denied access to a phone, Mason was transferred to the Federal Correctional Institute at Otisville, New York ("Otisville") on August 7, 1989. His conduct at Otisville placed him once again in disciplinary segregation.

On August 15, 1989, Mason was charged alone in a superseding indictment with, among other crimes, ordering the murder of Officer Byrne. After arraignment on the new charges, Mason was again placed in the MCC. When staff noted a sudden change in his behavior, he was sent to MCC staff psychologist Parry Hess. Dr. Hess noted that Mason displayed "paranoid delusions accompanied by agitation and violent outbursts, selective mutism, social withdrawal, marked weight loss, and poor hygiene" and recommended that he be sent to a forensic psychiatric facility for evaluation.

On September 15, 1989, Mason was transferred to the Medical Center for Federal Prisoners in Springfield, Missouri ("Springfield"). Mason submitted to an initial interview with Dr. Richard D'Andrea, a clinical psychologist at Springfield, but thereafter refused to permit further interviews, psychological tests, or a physical examination. Based on the initial interview and about fifteen brief visits to Mason's cell, Dr. D'Andrea wrote a report that he filed with the district court on October 23, 1989. He concluded that Mason understood the charges against him, that Mason's unwillingness to cooperate with the Springfield staff was "volitional and not due to mental illness," and that he was competent to stand trial.

Mason was returned to the MCC in late October, 1989. On November 3, 1989, Mason was visited in jail by his mother and his court-appointed attorney, Harry Batchelder, Jr. Their purpose was to discuss a government offer to consider making a downward departure motion for Mason's mother, who faced sentencing for a recent narcotics conviction, if Mason would plead guilty. According to an affidavit that Batchelder filed with the district court on November 7, 1989, Mason was uncooperative and abusive during both the November 3 visit and a subsequent meeting three days later. He accused Batchelder of lying about his codefendants' willingness to testify against him at trial and conniving with the district court to have him transferred to the "Bug–House." According to Batchelder, Mason at times had a vacant stare, was unresponsive to questions, and did not comprehend the effect that his insistence on going to trial might have on his mother's sentence. Because he was "professionally uncomfortable" that Mason understood his advice or trusted that he would work in Mason's best interests, Batchelder requested that the district court replace him with another attorney.

On November 7, 1989, Mason appeared before the district court. When Judge Korman remarked, "Your lawyer indicated that you had some problems that you want to raise with me," Mason rejoined, "It's your lawyer, it ain't my lawyer. What can I say[?] All I can do is keep getting torched." Mo-

ments later, Judge Korman inquired, "Do you wish Mr. Batchelder to represent you or not?" Mason replied, "I don't wish to go to the hospital and the police be kicking on my doors and hollering and screaming on me. I don't wish a lot of things. I don't have no choice." After noting the strange behavior described in the Batchelder affidavit, the court stated to Mason that "one of our concerns is that you understand what's going on around you so that you could assist your lawyer in preparing a defense." Mason again answered unresponsively: "I cannot prepare for anything. I'm locked in 23 hours a day. How can I prepare for anything? I'm in bug houses. How can I prepare for anything?"

When Judge Korman asked if Mason would submit to another psychiatric examination, Mason did not answer the question. Instead he asked, "What is it I'm charged with? I don't even know what I'm charged with." Judge Korman then read Mason the indictment. After he read Count One, which charged a RICO offense, Mason asked for a definition of racketeering. Mason then expressed confusion as to why, after his initial arrest on state charges, he was facing federal charges other than conspiracy. The district court explained that the government had filed a superseding indictment. As the hearing drew to a close, the court asked Mason if he had any other questions. Mason responded, "Yeah. I just wanted to know my status, why I got to keep going through these tribulations. If you're going to give me life [imprisonment], you're going to give me life anyway." He expressed doubt that he could get a fair trial, and answered questions about whether he wanted to retain Batchelder as his counsel with complaints about having no access to the prison law library and being asked to deal with legal papers which "ain't dealing with the same issue."

Finally, Mason agreed to talk with a psychiatrist who would determine his competency, saying, "Yeah, I got to. I ain't got no choice." Mason's resolve was short-lived. On November 16, when Dr. Naomi Goldstein accompanied Batchelder to the MCC, Mason refused to see her, expressing distrust of her because she worked for the government.

## II. Trial

On November 27, 1989, Mason appeared in court for jury selection. Batchelder requested a hearing on the issue of Mason's competency to stand trial. Judge Korman questioned the need for the hearing since Mason had already been found competent. Batchelder responded that he wished to cross-examine Dr. D'Andrea about his report, especially given Mr. Mason's repeated assertions, even after the November 7 hearing, that he did not understand "what he was being tried for." Judge Korman discounted those statements as not indicative of incompetency: "At best that is an ambiguous statement. At best it could reflect that he doesn't think he did anything wrong." Judge Korman then conversed with Mason, who repeated that he did not understand why he was being charged for crimes other than conspiracy and why no codefendants were present.

The court remarked that Mason had been found competent by a psychiatric expert and had appeared competent in his court appearances. It nonetheless called Dr. D'Andrea in for a hearing. The court proceeded to select a jury with Mason present.

When proceedings commenced the next day, November 28, 1989, Mason refused to attend. Judge Korman advised Mason that the trial would go on without him and explained at some length that he was only hurting himself by refusing to assist in his defense. Mason replied that he was not prepared for trial and that he could not get a fair trial. He again protested that he was facing new charges: "I come from [state prison] and I don't know what I'm coming to court for and now I have different charges. I know some of these people. I know them." After this interchange, Mason opted to be absent for the trial. The district court adopted Batchelder's suggestion to set up an audio connection to Mason's holding cell so that he could hear the proceedings. The audio connection could not be established that day, during which the jury was sworn and the government called and questioned witnesses outside Mason's presence.

On November 29, 1989, Mason attended the trial in the morning, when several police

officers who investigated Officer Byrne's murder testified. During one detective's testimony, Mason stood up, causing the court to call a recess. Batchelder informed the court that Mason wished to return to his cell. The court explained again that Mason's decision was unwise, that he was entitled to participate, that he had missed a significant part of the trial, and that by assisting his attorney he might be able to convince the jury that the government did not carry the burden of proving his guilt beyond a reasonable doubt. Aggrieved that he was being charged with federal charges relating to the murder of Officer Byrne, Mason stated that there was "no sense me going to trial" and that he wanted to return to his cell. Nevertheless, Mason attended the proceedings for the rest of that day.

That afternoon, the court held a competency hearing at which both Dr. D'Andrea and Batchelder testified. Dr. D'Andrea testified that he conducted an initial interview of Mason lasting thirty to forty minutes, saw him at staff meetings, and had brief three to five minute visits with Mason in his cell about twelve to fifteen times. No psychological tests were conducted. Dr. D'Andrea reported his conclusion that Mason was antisocial but not psychotic, that Mason's behavior was volitional, and that he understood the nature of the charges against him. Batchelder testified about Mason's threats against him, an episode in which Mason attempted to attack him physically, and his unresponsiveness and lack of comprehension of the charges against him. After the hearing, the court found that Mason was "entirely competent." Judge Korman expressed concern about Batchelder's relationship with Mason, and asked if Mason's conduct since coming back from Otisville had any detrimental impact on his ability to prepare the case. Batchelder said that it did not.

Mason did not attend the trial after November 29, 1989. On November 30 and December 1, only legal arguments were made because the government's next witness was unavailable. By December 4, the next day of trial, a closed-circuit camera had been added to allow Mason to see the trial from the holding cell. Mason did in fact watch some of the trial in this manner, although technical problems caused him to miss the summations and one day in which evidence was taken. The jury found Mason guilty on all counts in the indictment.

III. Posttrial Proceedings and Evaluations

Shortly after his conviction, Mason's behavior became more erratic. He refused to shower, change his clothes, clean his cell, or interact with MCC staff or inmates. When denied cosmetic items, Mason broke a window and threatened to kill a corrections officer. As a result of Mason's behavior, the government asked for a report from the MCC on his mental status. The court ordered Dr. Daniel Schwartz, a forensic psychiatrist, to evaluate Mason's competency to be sentenced.

Dr. Schwartz examined Mason on May 23, 1990, and found him "apparently so overwhelmed by his rage and paranoid beliefs that he could not address himself to the reality of his legal situation." Dr. Schwartz noted that Mason had "apparently regressed to the point of massive denial of stressful reality," particularly the fact of his conviction, and "rant[ed] and rav[ed] about revenge."

On May 30, 1990, prior to filing his report, Dr. Schwartz testified about his evaluation at a hearing before the district court. At one point, Dr. Schwartz mentioned that he was not questioning the finding that Mason was fit to stand trial. Judge Korman interrupted him, saying,

Please stop. I didn't make a final judgment on his fitness to stand trial. I sort of wanted to have the record completed on that. I want to ask you what your judgment about that is, to the extent that you can give one.

Judge Korman then went on to remark that, as a layman, he was satisfied that Mason understood the charges against him, but "the part that I never quite put to rest in my own mind was his ability to assist in his own defense." Dr. Schwartz stated that he was inclined to defer to the court and Dr. D'Andrea, who had not only interviewed Mason prior to trial but had observed him at Springfield. Nevertheless, at the court's prompt-

ing, Dr. Schwartz addressed the issue of Mason's competency to stand trial in his report of July 27, 1990. Dr. Schwartz concluded that, although Mason was unfit to be sentenced at that time, he was competent at the time of trial in November and December of 1989.

In the meantime, Mason was returned to Springfield for further evaluation. In Springfield, forensic psychologist Dr. Michael Morrison evaluated him between June 12 and July 9, 1990. Mason again refused to submit to physical examinations or psychological testing. While noting the difficulties of evaluating a recalcitrant subject, Dr. Morrison concluded that Mason's lack of cooperation was volitional and that Mason was antisocial but not psychotic or suffering from any major mental illness.

On November 16, 1990, Mason appeared before the district court for a status conference. Discerning a "distinct difference" from prior appearances during which he had been able to converse rationally with Mason, Judge Korman now described Mason as "ranting and raving." Judge Korman ordered another psychiatric examination of Mason.

At Mason's request, the court appointed Dr. Abraham Halpern, a psychiatrist, to conduct an examination, which occurred on January 17, 1991 in the courthouse holding cell. Dr. Halpern diagnosed Mason as having "bipolar disease, manic," and pronounced him incompetent to be sentenced. Furthermore, after reviewing prior reports, affidavits, and trial transcripts, Dr. Halpern declared Mason incompetent at the time of trial. He discounted Mason's seeming rationality in court appearances as manifestations of "fluctuating competency" and not indicative of general competency to stand trial. At a competency hearing on February 24, 1992, the court questioned Dr. Halpern at length about how one distinguishes volitional disruptive behavior from psychotic conduct. Judge Korman voiced his view that some of Mason's irregular conduct was susceptible of rational explanation.

In a court hearing held in March, 1992, another psychiatrist weighed in with an evaluation of Mason. Dr. John Phelan, in consultation with other Springfield staff, evaluated Mason during the latter's stay in Springfield from May 3, 1991 to January, 1992. Dr. Phelan concluded that Mason was antisocial but rejected Dr. Halpern's diagnosis of bipolar disorder, since such a disorder is unlikely to develop suddenly in an adult of Mason's age who has no prior history of the disease. Dr. Phelan explained Mason's past ranting and raving, which did not recur during his observation of Mason at Springfield, as perhaps a "brief reactive psychosis," but not conclusive evidence of a major mental disorder. Contrary to Dr. Halpern's conclusion, he also said that Mason's on-and-off irrational behavior observed by the court tended to show that he was malingering and not suffering from mental illness.

In April of 1992, the court reappointed Dr. Naomi Goldstein to evaluate Mason. Mason was polite and cooperative in an interview Dr. Goldstein conducted on September 11, 1992. He understood that he had been convicted of ordering the murder of Officer Byrne but denied guilt. He was able to explain the functions of the judge, jury, and counsel, and discussed his relationship with his attorneys. Dr. Goldstein diagnosed Mason as suffering from an antisocial personality disorder and probable atypical psychosis, but not active psychosis. She believed that he was not clearly psychotic in 1989, although she could not rule out the possibility of psychosis, especially after his conviction. She reported that Mason's paranoia may have reached delusional intensity some time that year and that he also may have regressed in isolation, becoming neglectful of his personal hygiene. Nonetheless, Dr. Goldstein decided that, in the aftermath of his trial, "Mason underst[ood] only too well what has happened and has had some difficulty adjusting to the prospect of a lifetime incarceration and to the betrayal of his friends." She noted that Mason had been stable since winter and spring of 1992. In sum, Mason was probably neither a malingerer nor psychotic, but more likely he was "so preoccupied with being respected, with power, strength and violence, [that he] had suddenly lost external control and decided that the only way to deal with it was to resist and not participate actively in a

lost cause, a conscious decision over which he had control." Dr. Goldstein concluded that he was competent at the time of trial, though probably depressed, and was currently competent to be sentenced.

On January 7, 1994, weighing all the evidence, the district court ruled that Mason had been competent to stand trial and was competent to be sentenced. The district court sentenced Mason to life imprisonment. This appeal followed.

## DISCUSSION

Mason raises four claims of error on appeal. He argues that the district court improperly (1) placed upon him the burden of proof to establish incompetency; (2) concluded that he was competent to stand trial and to be sentenced; (3) permitted him to waive his right to attend trial before it found him competent to waive that right; and (4) tried him *in absentia* without informing him expressly of his constitutional right to be present and securing a specific waiver on the record.

### I. Burden of Proof of Competency

■ The Supreme Court has set forth a two-prong test for determining competency to stand trial. The defendant must have (1) "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and (2) "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960) (per curiam); *United States v. Hemsi,* 901 F.2d 293, 295 (2d Cir.1990). In the federal courts, competency is determined by a preponderance of the evidence. 18 U.S.C. § 4241(d).

■ The district court held that, under 18 U.S.C. § 4241(d), the defendant bears the burden of proving incompetency to stand trial and be sentenced despite longstanding contrary authority in other circuits. *See United States v. Teague,* 956 F.2d 1427, 1431 n. 10 (7th Cir.1992); *United States v. Frank,* 956 F.2d 872, 875 (9th Cir.1991), *cert. denied,* — U.S. —, 113 S.Ct. 363, 121 L.Ed.2d 276 (1992); *United States v. Velas-*

*quez,* 885 F.2d 1076, 1089 (3d Cir.1989), *cert. denied,* 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990); *United States v. Hutson,* 821 F.2d 1015, 1018 (5th Cir.1987); *United States v. DiGilio,* 538 F.2d 972, 988 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977); *United States v. Makris,* 535 F.2d 899, 906 (5th Cir.1976). The district court reasoned that the holdings of those cases were predicated on the common assumption that the Due Process Clause required the government to bear the burden of proof. In its view, that assumption was undercut by the Supreme Court's recent decision in *Medina v. California,* — U.S. —, — – —, 112 S.Ct. 2572, 2580–81, 120 L.Ed.2d 353 (1992), which held that California's allocation of the burden to the defendant did not offend due process. Approaching the issue afresh, the district court employed both textual and functional analysis in deciding that under § 4241 the defendant should carry the burden. Mason contends that *Medina* did not alter federal standards. He argues that the court therefore improperly assigned him the burden of proving incompetency and that such error requires reversal.

■ The federal statute providing for competency hearings does not allocate the burden of proof, and neither the Supreme Court nor this court has decided as a matter of statutory construction whether the government or defendant bears the burden. We decline, however, to reach this issue today. "[T]he allocation of the burden of proof to the defendant will affect competency determinations only in a narrow class of cases where the evidence is in equipoise; that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent." *Medina,* — U.S. at —, 112 S.Ct. at 2579 (interpreting state law); *DiGilio,* 538 F.2d at 988. Here, the evidence was not in equipoise in the mind of the district court. In a supplemental finding dated March 1, 1994, the district court clarified that its competency ruling did not depend on whether the government or the defendant bore the burden of proof.

■ Mason challenges the supplemental finding on the ground that it was issued after

the entry of the notice of appeal on January 13, 1994. The notice of appeal, he contends, divested the district court of the power to make the supplemental finding. We disagree. While an effective notice of appeal, see Fed.R.App.P. 4(b), does divest the district court of its control over those aspects of the case involved in the appeal, a district court still may act in "aid of the appeal." *United States v. Ransom*, 866 F.2d 574, 575–76 (2d Cir.1989) (per curiam). Unlike *Ransom*, which held that a district court does not have the power to change a sentence to eliminate a term of supervised release and alter a restitution order, this is not a case where a district court acted impermissibly "to modify a judgment substantively" while an appeal was pending. *Id.* at 575–76. Here, the district court simply clarified that its finding of competency did not depend on the allocation of the burden of proof, thereby aiding this court in avoiding unnecessary construction of a statute and a possible remand, the outcome of which would have been a foregone conclusion. While it would have been better for the district court to have bypassed the burden of proof issue in its ruling since it had no effect on the outcome, the supplemental finding was a permissible act in aid of this appeal.

## II. The District Court's Finding of Competency

■ In making a determination of competency, the district court may rely on a number of factors, including medical opinion and the court's observation of the defendant's comportment. *Hemsi*, 901 F.2d at 295. We will uphold a district court's finding unless clearly erroneous. *United States v. Gold*, 790 F.2d 235, 239–40 (2d Cir.1986). "Where there are two permissible views of the evidence as to competency, the court's choice between them cannot be deemed clearly erroneous." *United States v. Villegas*, 899 F.2d 1324, 1341 (2d Cir.), *cert. denied*, 498 U.S. 991, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990).

### A. *Competency to Stand Trial*

■ Mason attacks the district court's finding that he was competent to stand trial on a number of grounds. He argues that the district court's conclusion that he was malingering was unsupported by any of the psychiatric testimony and inconsistent with Mason's behavior during his detention. It is also, in his view, inconsistent with psychiatric evaluations beginning in 1977 in which experts found evidence of mental illness and delusional behavior. Finally, he faults Dr. Goldstein's conclusion that Mason was competent both to be tried and to be sentenced, upon which the district court placed great weight, as unreliable since Dr. Goldstein admitted that she could not determine precisely what ailed Mason. Mason argues that the district court should instead have credited the testimony of Dr. Halpern, who in 1991 found that Mason was incompetent at the time of trial, and Dr. Schwartz, who in 1990 found him incompetent to be sentenced.

The district court's conclusion that Mason's noncooperation at trial was a "deliberate and calculated act" was not clearly erroneous. First, Judge Korman was entitled to rely on his own observations and questioning of Mason, as he expressly did in making his final finding of competency on January 7, 1994. *See Hemsi*, 901 F.2d at 295. Second, Mason's claim that all of the psychiatric reports contradict a finding of deliberate, calculated action is factually inaccurate. Dr. D'Andrea had concluded that Mason had an antisocial personality disorder and that his acts of noncooperation were volitional, findings that the district court specifically adopted as consistent with his own observations of Mason's conduct. Dr. Phelan testified that "on-and-off" acts of noncooperation tended to show malingering and not mental illness. Finally, the district court specifically relied on Dr. Goldstein's conclusion that, while outright malingering could explain his behavior, the better view was that Mason, "so preoccupied with being respected, with power, strength, and violence, had suddenly lost external control and decided that the only way to deal with it was to resist or not participate actively in a lost cause, a conscious decision over which he had control." Substantial medical opinion thus supported the district court's finding of competency.

The fact that five of the six reports cited by Mason that were conducted between 1977 and 1994 indicated evidence of paranoia or paranoid delusions, and that two indicated the possible onset of psychosis at certain periods, does not undermine the district court's finding of competency. "It is well-established that some degree of mental illness cannot be equated with incompetence to stand trial." *United States v. Vamos*, 797 F.2d 1146, 1150 (2d Cir.1986), *cert. denied*, 479 U.S. 1036, 107 S.Ct. 888, 93 L.Ed.2d 841 (1987). The mental illness must deprive the defendant of the ability to consult with his lawyer "with a reasonable degree of rational understanding" and to understand the proceedings against him rationally as well as factually. *Dusky*, 362 U.S. at 402, 80 S.Ct. at 788. Moreover, while the district court may consider psychiatric history in its deliberations, *see Newfield v. United States*, 565 F.2d 203, 206 (2d Cir.1977), "[t]he question of competency to stand trial is limited to the defendant's abilities at the time of trial," *Vamos*, 797 F.2d at 1150.

The 1977 evaluation preceded the trial by twelve years. More importantly, its impact is weakened by a longer psychiatric report in 1982 which found that Mason did not suffer from mental illness. Two of the reports Mason cites—Dr. Schwartz's diagnosis of Mason as suffering paranoid delusions and an adjustment disorder "apparently of psychotic proportions" six months after trial, and Dr. Goldstein's opinion that he may have had psychotic episodes between 1989 and 1994 during periods of exceptional stress—also do not directly bear upon Mason's competency at the time of trial. Significantly, both Dr. Schwartz and Dr. Goldstein opined that Mason's mental problems did not render him incompetent to stand trial.

The other three reports also do not show the district court's finding to be clearly erroneous. Dr. Hess offered no opinion as to whether Mason's display of paranoid delusions in August, 1989 adversely affected his legal competency; moreover, his reports on Mason were considered by Dr. Schwartz and Dr. Goldstein, who both found him competent. Judge Korman was also entitled to discount the November, 1989 observation of paranoid delusions and hallucinations made by an MCC psychiatrist, Dr. Quinones, in light of Judge Korman's own impressions and the more comprehensive evaluations by other medical experts.

The sixth report, issued by Dr. Halpern, followed a thorough psychiatric evaluation in which Dr. Halpern deemed Mason incompetent to have stood trial in 1989. Judge Korman gave detailed reasons for discrediting Dr. Halpern's testimony and report. First, making a credibility determination that we cannot question on appeal, he noted that Dr. Halpern "impressed [him] as a paid defense witness who was doing his best to come up with answers that would help the party who retained him." Second, he criticized Dr. Halpern for failing to take account of key court proceedings and testimony. Third, Judge Korman faulted Dr. Halpern for placing undue weight on the testimony of Mason's attorney, Batchelder, which Judge Korman dismissed as "flatly inaccurate in some respects and exaggerated in others." This lone diagnosis of incompetency at the time of trial by "one member of an uncertain profession," which conflicts with opinions of other qualified experts, "is too pale a shadow to darken" the district court's judgment of competency. *Reese v. Wainwright*, 600 F.2d 1085, 1094 (5th Cir.), *cert. denied*, 444 U.S. 983, 100 S.Ct. 487, 62 L.Ed.2d 410 (1979); *cf. Zovluck v. United States*, 448 F.2d 339, 341–42 (2d Cir.1971) (upholding district court's determination despite contrary psychiatric testimony), *cert. denied*, 405 U.S. 1043, 92 S.Ct. 1327, 31 L.Ed.2d 585 (1972).

Finally, Mason argues that the transcripts of the early court appearances, together with the Batchelder affidavit, demonstrate his mental incoherence and his failure to comprehend the charges against him. While that is one plausible reading, it is at least equally plausible to read Mason's statements as evincing resignation and frustration but not irrationality. We must in these circumstances defer to the judgment of the district court, which had the benefit of examining Mason and hearing from the fact and expert witnesses in person. In summary, the district court was entitled to rely upon its own impressions of Mason and the supporting

opinions of Drs. D'Andrea, Morrison, Phelan, Schwartz, and Goldstein in concluding that Mason had a rational understanding of the charges against him and the ability to assist his lawyer in mounting his defense. No clear error was committed in the determination that Mason was competent at the time of trial.

### B. *Competency to Be Sentenced*

■■■ There is also no basis for overturning the district court's finding that Mason was competent to be sentenced in January of 1994. In Dr. Goldstein's July, 1993 report, which was the only medical evaluation of Mason performed near the time of Mason's sentencing, she found that "[t]here is no evidence of active psychosis or manic depressive illness at this time and he appears to be in better control than he has been previously." She concluded that Mason was competent to understand and participate in his sentencing. In addition, during the January, 1994 hearing, Judge Korman reviewed numerous statements that evinced Mason's understanding of criminal responsibility, sentencing, and the consequences that sentencing would have in terms of his future incarceration.

Mason did interrupt the court in the midst of its oral decision with rambling statements of his innocence and the pervasiveness of drugs in the neighborhood where he grew up. Mason's attorney at sentencing, Ivan Fisher, then noted for the record that "during this proceeding as well as [another], the defendant has on numerous occasions gotten on all fours, put his head close to the floor, and then stood up again." Judge Korman stated that he was willing to accept a more moderate view of Mason's condition but that his own view was that Mason's behavior was "all calculated fakery." Consequently, he adhered to his determination that Mason was competent to be sentenced.

On the cold record on appeal, and in light of Judge Korman's extended effort to secure a range of medical opinion about Mason's competency, we are not prepared to find clear error in this determination.

### III. Waiver of Right to Be Present at Trial

■■■ The accused has a constitutional right derived from the Fifth and Sixth Amendments to be present at all stages of his trial, including the impaneling of the jury. *United States v. Pastor,* 557 F.2d 930, 933 (2d Cir.1977). However, this right may be waived. *Illinois v. Allen,* 397 U.S. 337, 342–43, 90 S.Ct. 1057, 1060–61, 25 L.Ed.2d 353 (1970); *United States ex rel. Bloomfield v. Gengler,* 507 F.2d 925, 929 n. 5 (2d Cir.1974). Waiver of a constitutional right is only valid if the defendant is competent. The same standard of competency applies to the capacity to stand trial and the waiver of constitutional rights: "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" *Godinez v. Moran,* —— U.S. ——, ——, 113 S.Ct. 2680, 2685, 125 L.Ed.2d 321 (1993) (waiver of rights to counsel and to plead guilty) (quoting *Dusky,* 362 U.S. at 402, 80 S.Ct. at 788). When a court determines whether it should accept a waiver, assessing competency is only the first of a two-part inquiry. "[T]he waiver must also be intelligent and voluntary before it can be accepted." *Id.* at ——, 113 S.Ct. at 2688.

### A. *Failure to Hold Competency Hearing Prior to Waiver*

■■■ Mason claims that the waiver is invalid because it was made before the district court established competency. He argues further that the court's determination of competency at the initial hearing on November 29, 1989 is of doubtful validity because the district court reopened the issue on numerous occasions over the next four years. Moreover, he contends that the November 29 hearing, like all of the competency hearings held in this case, was impermissibly retrospective.

As a preliminary matter, we disagree with Mason's characterization of the proceedings in this case. It cannot fairly be said that the district court only determined Mason's competency to stand trial retrospectively, even if it did not conclude its inquiry until January, 1994. The record indicates that the district

court found Mason competent to stand trial (and therefore necessarily competent to waive his rights) before accepting Mason's waiver on November 28, 1989. The Springfield psychologist, Dr. D'Andrea, had filed a report with the district court on October 23, 1989 in which he concluded that Mason was competent to stand trial. When Mason's attorney Batchelder raised questions as to his client's state of mind, the district court questioned Mason directly on November 27, 1989. At the end of the colloquy, when Batchelder requested a chance to examine Dr. D'Andrea at the hearing, the district court responded,

> The psychological evaluation found that he was fit to s[t]and trial. When he was here before me the last time he was entirely rational[ ]. He understood the questions. The questions he asked today are not irrational.
>
> I am willing to appoint another psychologist at your request to conduct another evaluation. He has declined t[w]o. I don't know what else I can do to assure that he's competent. He seems to me that he's competent. I'm willing to hold a hearing to have the psychologist ... from Springfield testify.

■■■■ The validity of this initial determination of competency is not necessarily undermined by the fact that it was made without the benefit of a hearing. Neither the federal statute governing competency determinations, 18 U.S.C. § 4241, nor the Due Process Clause requires a hearing in every instance; a hearing is required only if the court has "reasonable cause" to believe that the defendant has a mental defect rendering him incompetent. *See* 18 U.S.C. § 4241(a); *Pate v. Robinson*, 383 U.S. 375, 385–86, 86 S.Ct. 836, 842, 15 L.Ed.2d 815 (1966) (holding that the failure of a trial court to hold a competency hearing *sua sponte* may violate due process if there is sufficient evidence to cast doubt upon a defendant's competency); *Phillips v. Lane*, 787 F.2d 208, 216 (7th Cir.) (holding that, under due process, a hearing is required if "at the time of the trial or hearing the judge had a substantial reason to doubt the defendant's fitness"), *cert. denied*, 479 U.S. 873, 107 S.Ct. 249, 93 L.Ed.2d 173 (1986); *see also Nicks v. United States*, 955

F.2d 161, 168 (2d Cir.1992) (finding standards under § 4241 and the Due Process Clause essentially equivalent). Because "[t]he necessity for a competency hearing varies in each case, depending upon a number of factors concerning defendant's behavior and inferences which might be drawn from psychiatrists' reports," *United States ex. rel. Mireles v. Greer*, 736 F.2d 1160, 1165 (7th Cir.1984), the "[d]etermination of whether there is 'reasonable cause' to believe a defendant may be incompetent rests in the discretion of the district court." *Vamos*, 797 F.2d at 1150; *United States v. Hall*, 523 F.2d 665, 667 (2d Cir.1975); *see also Drope v. Missouri*, 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975) ("There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed....").

■■■■ In deciding that an evidentiary hearing is unnecessary, a court may rely not only on psychiatrists' reports indicating competency but also on its own observations of the defendant. *Greer*, 736 F.2d at 1165. In *United States v. Oliver*, 626 F.2d 254 (2d Cir.1980), we upheld the district court's decision not to order a psychiatric examination and subsequent hearing based solely on the judge's direct observation and questioning of the defendant, despite evidence of the defendant's low intelligence, prior history of heavy drug use, lapses of memory, and unresponsiveness. *Id.* at 258–59.

Even if we were to find that the Batchelder affidavit of November 7 was sufficient to require the November 29 hearing, we would find no error in the fact that the hearing was held the day after Mason first waived his right to attend trial. In *United States v. Purnett*, 910 F.2d 51, 55 (2d Cir.1990), we held that a district court could not deem a waiver of the right to counsel knowing and voluntary if at the same time it had doubts as to the defendant's competency. Unlike in *Purnett*, where the court raised the issue of the defendant's competency *sua sponte* after observing his behavior, *id.* at 53, here Judge Korman did not harbor serious doubts about Mason's competency at the time of waiver. Apparently, he ordered the hearing as a precautionary measure in case new evidence or

cross-examination of Dr. D'Andrea might cast doubt on the doctor's submitted report: We decline to extend *Purnett* into an automatic adjournment rule every time the district court inquires further into competency. Such a rule would allow a manipulative defendant (as Judge Korman suspected Mason to be) to bring the trial to a halt at his whim.

■ Holding the competency hearing the day after the waiver did not invalidate the waiver. "The fact that the court made the competence finding *during* (rather than in advance of) the trial means only that the court might have had to declare a mistrial, a calculated risk" that the court was entitled to take in light of its observations of Mason and its desire not to allow Mason to dictate the timing of the trial. *Brown v. Doe*, 2 F.3d 1236, 1247 (2d Cir.1993) (upholding decision not to adjourn trial, which defendant attended, until competency determination was completed), *cert. denied,* —— U.S. ——, 114 S.Ct. 1088, 127 L.Ed.2d 403 (1994).

Finally, we are not persuaded by Mason's attempt to derogate the November 29 hearing as "retrospective" and thus disfavored under the Supreme Court's decisions in *Dusky, Pate,* and *Drope.* First, it is questionable whether a competency hearing held on the second day of trial even deserves the label "retrospective." In any event, there was no time lapse remotely comparable to that in *Pate,* 383 U.S. at 387, 86 S.Ct. at 843 (lapse of six years), or *Drope,* 420 U.S. at 183, 95 S.Ct. at 909 (lapse of almost six years), or even *Dusky,* 362 U.S. at 402, 80 S.Ct. at 788 (lapse of over one year with no prior psychiatric evaluation under correct legal standard). Second, whereas no proper competency examination had been conducted before or during trial in any of the three aforementioned cases, *see Drope,* 420 U.S. at 176, 179–81, 95 S.Ct. at 906, 907–08; *Pate,* 383 U.S. at 383–86, 86 S.Ct. at 840–42; *Dusky,* 362 U.S. at 402–03, 80 S.Ct. at 788–89, here the clinical psychologist who testified at the November 29 hearing specifically found Mason competent to stand trial in a report filed about five weeks prior to trial after a month of observation of Mason. Third, this is not a case where the trier of the fact of competency was deprived of any

opportunity to supplement the expert opinions with direct observation of the defendant, which was one reason the Court gave for rejecting the option of a retrospective hearing in *Pate. See* 383 U.S. at 387, 86 S.Ct. at 843. In this case, Judge Korman directly observed and questioned Mason on two occasions just prior to trial.

The district court's revisiting of the issue over the next four years also does not, as Mason argues, render the district court's final competency ruling in this case impermissibly retrospective. A court assessing competency will necessarily encounter " 'the uncertainty of diagnosis in this field and the tentativeness of professional judgment.' " *Drope,* 420 U.S. at 176, 95 S.Ct. at 906 (quoting *Greenwood v. United States,* 350 U.S. 366, 375, 76 S.Ct. 410, 415, 100 L.Ed. 412 (1956)). After Mason's behavior turned for the worse following his conviction, and Dr. Daniel Schwartz, a forensic psychologist, pronounced him mentally unable to comprehend the nature and purposes of any sentence that might be imposed upon him, the district court understandably sought re-evaluation of Mason's fitness at the time of trial. We do not take Judge Korman's statement that "the part that I never quite put to rest in my own mind was his ability to assist in his own defense" as an admission that his initial finding of competency was erroneous. Rather, it indicates that Mason's competency was in 1990 a close question in his mind, and that he could be swayed by persuasive expert testimony to the contrary. Even though he later "second-guessed" himself for not holding a full-scale hearing before trial commenced, and at times characterized his findings as "preliminary," Judge Korman never abandoned his determination that Mason was competent to stand trial. In an effort to do Mason justice, the court entered the dark forest of conflicting professional opinion, from which it took another three years to emerge. In the end, the court was at peace with its original decision, stating on January 7, 1994, "I made a finding at the trial, although it was not elaborated upon, that I believe that the defendant was competent at that time. And I reaffirm that finding at this point."

In summary, the district court accepted Mason's waiver of his right to be present during his trial on November 28, 1989. The court determined at least by the following day, if not prior to accepting the waiver, that Mason was competent. The possible lapse of only a day between the waiver and the competency determination did not invalidate the waiver or render the determination impermissibly retrospective. The district court's re-examination of the issue with the aid of new expert reports and testimony over the ensuing years also did not undermine the findings of competency made on November 28 and 29, 1989, which the district court expressly reaffirmed on January 7, 1994. We hold that the district court properly established that Mason was competent to waive his right to attend trial.

### B. *Knowing and Voluntary Waiver*

▮ Rule 43(a) of the Federal Rules of Criminal Procedure requires a defendant to be present at "every stage of the trial including the impaneling of the jury." Rule 43(b)(1), however, allows a defendant "initially present" to waive his right to attend after the trial commences. After attending jury selection on November 27, 1989, Mason declined to attend trial the next day. Mason does not contend on appeal (nor did he below) that he was not entitled to waive his right at that time. He claims instead that the district court improperly tried him *in absentia* because it failed to secure an "intelligent and voluntary" waiver, *Godinez*, —— U.S. at ——, 113 S.Ct. at 2688, of his constitutional right to attend trial.

We articulated the standard for determining the permissibility of a defendant's waiver of the right to attend trial in *United States v. Fontanez*, 878 F.2d 33, 35–36 (2d Cir.1989) (citations omitted):

> In reviewing a case where the trial proceeded in the defendant's absence, we examine the trial record in light of three issues. First, we review whether the district court properly exercised its discretion in finding that the defendant knowingly and voluntarily waived the right. If the court properly found the right to be waived, we next consider whether the dis-

trict court abused its discretion in concluding there was on balance a controlling public interest to continue the trial in the defendant's absence. Finally, if the district court was in error to continue the trial in a defendant's absence, we ask whether that error was harmless error.

We turn first to the issue of voluntariness. The fact that Mason was in custody does not itself preclude a voluntary waiver. *Wilson v. Harris*, 595 F.2d 101, 104 n. 3 (2d Cir.1979). In this case, there is no question that Mason's absence was voluntary. This is not a case, for example, in which the defendant's failure to attend resulted from police detention, *see Fontanez*, 878 F.2d at 36; *United States v. Crutcher*, 405 F.2d 239, 243 (2d Cir.1968), nor a case in which any other external circumstance such as illness, *see United States v. Toliver*, 541 F.2d 958, 963–64 (2d Cir.1976), prevented Mason from freely exercising his right to attend trial. Competent at the time, Mason chose of his own volition to remain in his holding cell throughout most of the trial. The only issue remaining is whether his voluntary waiver was knowingly made. *See United States v. Tortora*, 464 F.2d 1202, 1208 (2d Cir.) ("A defendant who deliberately fails to appear in court does so voluntarily, and thus the important question is whether his absence can be considered a 'knowing' waiver."), *cert. denied*, 409 U.S. 1063, 93 S.Ct. 554, 34 L.Ed.2d 516 (1972).

▮ Waiver can be either express or implied from the defendant's conduct. *Fontanez*, 878 F.2d at 36; *Tortora*, 464 F.2d at 1208; *see, e.g., Taylor v. United States*, 414 U.S. 17, 19–20, 94 S.Ct. 194, 195–96, 38 L.Ed.2d 174 (1973) (per curiam) (implied waiver from jumping bail in the middle of trial); *Allen*, 397 U.S. at 346–47, 90 S.Ct. at 1062–63 (implied waiver from disruptive behavior during trial). While only minimal knowledge on the part of the accused is required when waiver is implied from conduct, *see Taylor*, 414 U.S. at 19 & n. 3, 94 S.Ct. at 195 & n. 3; *United States v. Mera*, 921 F.2d 18, 20–21 (2d Cir.1990); *see also* Fed.R.Crim.P. 43(b)(1), different considerations apply when the waiver is expressly and properly made before the court, as hap-

pened in this case. In this circumstance, a waiver should not be accepted unless the court is satisfied that a defendant "actually *does* understand the significance and consequences of a particular decision and ... the decision is uncoerced." *Godinez*, —— U.S. at —— n. 12, 113 S.Ct. at 2687 n. 12.

■ Mason contends that it is not enough that a court inform the accused of the reasons he should attend the trial and encourage his attendance. He relies on *Carnley v. Cochran*, 369 U.S. 506, 516–17, 82 S.Ct. 884, 890–91, 8 L.Ed.2d 70 (1962) (reversing conviction because defendant did not make knowing and intelligent waiver of his right to counsel), to support his claim that the trial court must specifically and formally advise the defendant that he has a constitutional right to attend trial and inquire whether he waives it. In Mason's view, if formal instruction and inquiry were not made, we cannot affirm this conviction without "[p]resuming waiver from a silent record," which *Carnley* forbids. *Id.* at 516, 82 S.Ct. at 890.

Mason overstates *Carnley*, which does not require that a trial court specifically advise the accused that his right derives from the Constitution. In fact, it even suggests that formal notice of the existence of constitutional procedural rights does not substitute for an understanding of the consequences of exercising them or not. *Id.* at 511, 82 S.Ct. at 888. In *Carnley*, the Supreme Court rejected the view that waiver of the right to counsel is implied when the accused appears without counsel and fails to request that counsel be assigned to him, particularly when the accused pleads guilty. *Id.* at 515, 82 S.Ct. at 890. The Court held that "[t]he record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver." *Id.* at 516, 82 S.Ct. at 890.

■ The equivalent requirement in this context is that, when a defendant expresses a desire not to attend trial, the district court must ensure that the defendant knows that he has the opportunity to attend and knows the ramifications of his choices so that the decision to waive his right will be intelligently made. Here, the district court took great pains on two occasions to inform Mason of the benefits of attending trial. On November 28, 1989, when Mason first declared his intention to remain in his holding cell, Judge Korman even went down to Mason's cell to convince him to reconsider his decision. There, he admonished Mason that a trial cannot stop just because a defendant does not wish to participate. He emphasized that by attending trial Mason could suggest questions to his lawyer for cross-examination of witnesses cooperating with the government. Judge Korman even indicated that, if at any time during trial Mason needed time to confer with his lawyers about witness cross-examination, the court would take a recess. He reminded Mason that a criminal defendant only had to create reasonable doubt in the minds of the jury to secure an acquittal, and that a defendant who does not aid his lawyer is unlikely to be acquitted. On November 29, Judge Korman added that Mason's lawyer was doing a competent job attacking the government's evidence, implying that Mason's aid might help tip the balance in his favor. On that day, Judge Korman also conveyed to Mason that he had a right to attend trial, stating that Mason was "entitled to the opportunity to participate." Mason's waiver of his right to attend trial was thus both voluntary and knowing.

■ We turn finally to the question whether " 'the public interest [in proceeding with trial] clearly outweighs that of the voluntarily absent defendant' " in attending all stages of his trial. *Fontanez*, 878 F.2d at 37 (quoting *Tortora*, 464 F.2d at 1210). In *Tortora*, we held that in making this discretionary determination a district court should consider "a complex of issues," including:

> the likelihood that the trial could soon take place with the defendant present; the difficulty of rescheduling, particularly in multiple-defendant trials; the burden on the Government in having to undertake two trials, again particularly in multiple-defendant trials where the evidence against the defendants is often overlapping and more than one trial might keep the Government's witnesses in substantial jeopardy.

464 F.2d at 1210.

■ Although we stated in dicta in *Tortora* that "[i]t is difficult for us to conceive of

any case where the exercise of this discretion would be appropriate other than a multiple-defendant case," *id.* at 1210 n. 7, we have since clarified that a district court has "broad discretion" to proceed with trial even in single-defendant cases. *United States v. Sanchez,* 790 F.2d 245, 250–51 (2d Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 584, 93 L.Ed.2d 587 (1986). Because a defendant has "no unilateral right to determine the time or the circumstances under which he would stand trial," *Wilson,* 595 F.2d at 103, a district court generally acts within its discretion if it proceeds with trial when the defendant's absence is the product of sheer willfulness. As the Supreme Court has remarked,

"It does not seem to us to be consonant with the dictates of common sense that an accused person ... should be at liberty, whenever he pleased, ... to break up a trial already commenced. The practical result of such a proposition, if allowed to be law, would be to prevent any trial whatever until the accused person himself should be pleased to permit it.... This would be a travesty of justice which could not be tolerated.... [W]e do not think that any rule of law or constitutional principle leads us to any conclusion that would be so disastrous as well to the administration of justice as to the true interests of civil liberty....

The question is one of broad public policy, whether an accused person, placed upon trial for crime and protected by all the safeguards with which the humanity of our present criminal law sedulously surrounds him, can with impunity defy the processes of that law, paralyze the proceedings of courts and juries, and turn them into a solemn farce...."

*Diaz v. United States,* 223 U.S. 442, 457–58, 32 S.Ct. 250, 254–55, 56 L.Ed. 500 (1912) (quoting *Falk v. United States,* 15 App.D.C. 446, 454, 460 (D.C.Cir.1899), *dismissed for lack of jurisdiction,* 180 U.S. 636, 21 S.Ct. 922, 45 L.Ed. 709 (1901)).

Thus, while the *Tortora* factors pertinent to multiple-defendant trials undoubtedly intensify the public interest in proceeding with trial in a defendant's absence, there is an inherent public interest in preventing contumacious defendants from dictating the conduct of their trials, as *Diaz* makes clear.

There is also an element of public interest in avoiding inconvenience to assembled jurors and witnesses and the delay of other cases on the court's docket caused by an uncertain adjournment of the trial. In weighing the public interest in proceeding with trial against the defendant's cherished and fundamental right to be present, the district court must give due regard to the circumstances of the waiver. While there are circumstances in which it would be impermissible for a court to proceed with trial, *see, e.g., Fontanez,* 878 F.2d at 37 (holding it impermissible to proceed in a single-defendant case where court was informed that defendant's absence because of police detention would likely be brief), there is usually sufficient justification to do so even in the defendant's absence if the court finds the defendant to have engaged in "stonewalling and other misconduct," *Sanchez,* 790 F.2d at 250, or if "there is no reasonable likelihood that the trial could soon proceed with the defendant present," *id.* at 251. In this case, the district court viewed Mason as defiant and uncooperative, particularly in light of Dr. D'Andrea's diagnosis of him as an antisocial personality whose behavior was volitional. Mason's only explanation for his nonattendance was indifference to and disdain for the proceedings. Under such circumstances, we find no abuse of discretion in the district court's decision to proceed with trial.

Accordingly, we affirm the district court's judgment of conviction and sentence.