**UNITED STATES of America,**
**Appellee,**

v.

**Gabriel CEBALLOS, also known as Sealed Deft. # 3, also known as Gabriel LNU, Defendant–Appellant.**

**Docket No. 01–1431.**

United States Court of Appeals,
Second Circuit.

Argued: Feb. 18, 2003.

Decided: Aug. 14, 2003.

Glenn T. Suddaby, United States Attorney for the Northern District of New York, Albany, New York (Richard S. Hartunian, Tina E. Sciocchetti, Assistant United States Attorneys, Albany, New York, of counsel) filed a brief for Appellee.

Philip L. Weinstein, New York, New York (The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York, New York, on the brief), argued for Defendant–Appellant.

Before: KEARSE, and B.D. PARKER, Circuit Judges, and BERMAN, District Judge *.

* Honorable Richard M. Berman, of the United States District Court for the Southern District of New York, sitting by designation.

KEARSE, Circuit Judge.

Defendant Gabriel Ceballos ("Ceballos") was convicted in the United States District Court for the Northern District of New York, following a jury trial before Thomas J. McAvoy, *Judge,* on one count of conspiracy to possess and distribute heroin and cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and one count of conspiracy to bribe a public official, in violation of 18 U.S.C. §§ 201(b)(1)(A) and 371 ("bribery conspiracy"); he was sentenced principally to a 136–month prison term for the narcotics conspiracy offense and a 60–month term for the bribery conspiracy offense, to be served concurrently. Ceballos appeals from so much of the judgment as reflects his bribery conspiracy conviction, contending that the evidence at trial was insufficient to permit an inference that he was a member of that conspiracy. We agree and reverse so much of the judgment of the district court as convicts him of conspiring to bribe a public official.

## I. BACKGROUND

The present prosecution arose out of a 1999–2000 undercover investigation called "Operation Wild Card," conducted jointly by several law enforcement agencies, including the United States Drug Enforcement Administration ("DEA"), the then-Immigration and Naturalization Service ("INS" (which has since ceased to exist as an independent agency, *see* Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135 (Nov. 25, 2002))), and the New York State ("State") Police. The investigation culminated in a 34–count indictment charging more than three dozen individuals with narcotics trafficking, immigration violations, bribery, and/or conspiracy. Ceballos was charged with one count of narcotics conspiracy and one count of bribery conspiracy, and he stood trial alone.

The principal government witnesses at Ceballos's trial were INS special agent Thomas D. O'Connell, DEA special agent Ulises R. Delgado, and State Police senior investigator Samuel Mercado. There was no testimony from any cooperating coconspirator. The evidence at trial showed the following.

### A. *Operation Wild Card*

The primary goal of Operation Wild Card (or the "Operation") was the identification, arrest, and conviction of high-level drug traffickers operating in the New York City area. As a secondary goal, the law enforcement agents sought out aliens who were present in the United States illegally or who were engaged in criminal activity. In the Operation, Mercado and Delgado posed as drug dealers who distributed in upstate New York and Canada; O'Connell pretended to be a corrupt INS official who was willing, in exchange for cash, to provide illegal aliens with documents evidencing Permanent Resident Alien status, also known as "green cards." Mercado and Delgado dealt with individuals who both brokered green cards for illegal aliens and distributed narcotics.

One such broker was Pedro Gonzalez ("Gonzalez" or "Pedro"), who eventually led the agents to Ceballos. The general flow of the transactions was as follows. Mercado and Delgado purchased narcotics from Gonzalez; they were to pay him partly in cash and partly in green cards that they would obtain for illegal aliens with the help of the supposedly corrupt INS official. Mercado and Delgado generally charged Gonzalez between $5,000 and $9,500 per card (higher prices were charged for aliens who had criminal records or prior immigration problems), crediting these amounts against the price of the narcotics they received from Gonzalez. Gonzalez received payments from the aliens for the

green cards. He obtained narcotics from a supplier, planning to pay the supplier partly out of the cash he received from the aliens and partly out of the cash to be received from Mercado and Delgado upon their resale of the drugs. Gonzalez transported the aliens to a prearranged meeting place, usually a diner near Albany, from where they would be taken to the INS official to begin their green-card processing; on those trips Gonzalez also delivered the narcotics. Mercado and Delgado were to pay the INS official out of the cash generated by the sale of the narcotics they received from Gonzalez.

Between June 1999 and June 2000, Delgado, who had responsibility for receiving and processing the delivered drugs, and Mercado, who arranged for the aliens to meet with the INS official, had many dealings with Gonzalez. During that period, Gonzalez brought the agents 36 aliens for processing. Between June 1999 and mid-February 2000, he delivered to Mercado and Delgado 125 grams of cocaine and quantities of heroin ranging from approximately 100 to 544 grams. Delgado would receive the drugs and transfer them to another DEA agent for testing and safekeeping. The aliens would be taken to one of two adjacent motel rooms that housed the Operation. In that room, the supposedly corrupt INS official would fingerprint the aliens, take information relevant to applications for permanent resident alien status, and instruct the aliens on how to answer questions they might be asked by INS officials in the future. In the adjacent room, agents videotaped the fraudulent green-card activity.

After Gonzalez had made a delivery of 544 grams of heroin on October 15, 1999, for which Gonzalez charged the agents approximately $40,000, the agents gave him only a small payment and delayed paying the remainder. Their goal was to impede Gonzalez's ability to pay his supplier and to force him to turn to the agents for help in explaining that inability, thereby revealing his supplier's identity. As hoped, Gonzalez looked to the agents for help; as a result, the agents learned that Gonzalez's source for the October 15 heroin was one of the aliens they had processed earlier in October, Euler Soto Gallo. Thereafter, the agents dealt directly with Gallo for the drugs he supplied, and Gallo, like Gonzalez, brought aliens to the agents for green cards.

On March 22, 2000, Gonzalez brought the agents six aliens, along with one kilogram of relatively pure heroin that Delgado testified would, after dilution, have a street value of from $800,000 to more than $3 million. Gonzalez and Delgado had previously agreed that the agents would pay Gonzalez a total of $78,000, comprising $75,000 for the heroin and $3,000 as a delivery fee. Mercado learned that Gonzalez had bought the heroin for approximately $58,000. *See* Tr. 349 (Gonzalez "was going to be making about a $17,000 profit.")

The agents charged $30,000 for green cards for the six aliens brought on March 22. Deducting that amount from the $78,000 total to be paid to Gonzalez, the agents owed him $48,000. Delgado and Gonzalez had agreed that the agents would have some 7–10 days to make payment, although the balance could be reduced further if Gonzalez brought additional aliens for green cards. The agents again delayed making full payment to Gonzalez, hoping to force him to identify the supplier of these drugs. On April 4, 2000, Delgado and Gonzalez spoke by telephone. Gonzalez said he needed the money to pay his supplier; Delgado responded that he and Mercado had encountered problems in bringing in drug sale proceeds from Canada and had lost some $135,000, forcing

them to delay payment to Gonzalez. Although the agents offered to help Gonzalez explain the delay, Gonzalez resisted introducing them to his supplier, whom he described as a man who ran a computer business. During the next several weeks, Gonzalez brought additional aliens for green-card processing and thereby reduced the agents' debt to him from $48,000 to $11,300.

On May 11, Gonzalez buckled under the pressure he was receiving from his supplier, and he asked Mercado to speak directly with the supplier to explain why Gonzalez had not been able to pay the rest of the debt. As discussed in Part I.B. below, Gonzalez had his supplier, who was eventually identified as Ceballos, telephone Mercado.

A week or so later, Delgado and Gonzalez discussed the possibility of the agents' buying 10–12 kilograms of cocaine at $25,000 per kilo. In mid-June, they agreed that on June 15, Gonzalez would bring several aliens to Albany, and 10 kilograms of cocaine would be brought in another car by one of the supplier's workers. On June 15, Delgado and Gonzalez spoke several times while Gonzalez was waiting for the second driver, whom he identified as his supplier's son. Gonzalez stated that he was going to the home of his supplier, and a New York City surveillance team followed Gonzalez to the home of Ceballos. Delgado testified that, ultimately, the planned June 15 deliveries did not come to pass because Gonzalez

> had spoken to the father again and ... the father was able to get a hold of the son, the son was okay, but the ten kilograms of cocaine were in a vehicle, the vehicle could not be moved because it was hot, meaning the police was [sic] around, so at this point it could not be moved. As soon as things calmed down, it wasn't hot or the police wasn't [sic]

around, then his son, you know, would be able to finish doing this deal.

(Trial Transcript ("Tr.") 206–07.)

Mercado and Delgado remained in contact with Gonzalez for the next several days, and on June 20, Gonzalez revealed that he had only four kilograms of cocaine for the agents and that the supplier was raising the price. Delgado urged Gonzalez to try to get the remaining six kilograms, and they agreed that Gonzalez would bring aliens, with a second car transporting the cocaine, on June 21. The agents relayed this information to the surveillance team, with instructions to track the second car, intercept it when convenient, and arrest the driver.

On June 21, members of the surveillance team observed Gonzalez and five men rendezvous on a street corner in New York City with the second car, whose driver was later identified as Ceballos's son, Sergio Ceballos ("Sergio"). Gonzalez briefly spoke with Sergio and motioned two of the five men into Sergio's car. Gonzalez and the other three men then returned to Gonzalez's car, and the two cars departed. Sergio's car was soon stopped by the surveilling agents. Four kilograms of cocaine were found in the trunk, and Sergio was arrested.

When Gonzalez arrived at the agreed upstate diner later that day to meet with Delgado and Mercado, he was upset because he had lost sight of the car carrying the cocaine. He shortly received a telephone call informing him that the driver of that car, his supplier's son, had been arrested. The call was from the supplier; under repeated questioning from Mercado, Gonzalez confirmed that the supplier was the man they had referred to as the "computer guy," whose first name was Gabriel, and who was the supplier to whom Mercado had spoken on May 11. Gonzalez lamented the fact that two of the aliens had

been in the son's car "because they didn't have anything to do with the cocaine deal." (Tr. 222.)

The transactions phase of Operation Wild Card essentially ended on that day. On June 28, 2000, approximately 100 persons were arrested, including Ceballos, who was revealed to operate a computer business. When Mercado heard Ceballos speak, he identified Ceballos as the supplier to whom he had spoken by telephone on May 11.

### B. *The Conversations of May 11, 2000*

On May 11, 2000, while Mercado was away on vacation, he received numerous voice mail messages from Gonzalez. When he reached Gonzalez, Gonzalez said he was under a tremendous amount of pressure from his supplier to pay the rest of the money owed for the kilogram of heroin delivered on March 22. Gonzalez wanted to bring more aliens for green cards in order to raise the cash to pay his supplier; Mercado responded that he was out of town on business and could not have any aliens processed or get any money to Gonzalez before the following week. Gonzalez then asked Mercado to "call and talk to this guy directly and explain to him it's not me, I'm not trying to not pay him the money, it's that ... we haven't been able to raise money so I can pay the source." (Tr. at 351). Mercado agreed to talk to the supplier, instructing Gonzalez to have him call Mercado.

Mercado, whose undercover name was "Danilo," testified that he received the supplier's call no more than two minutes later. On direct examination by the government, he described the ensuing conversation as follows:

I said hello, and I go you probably don't know who I am, I'm Danilo, a good friend of Pedro's, he wanted you to call me. He said yes, that's why I'm calling.

I told him, I would like to explain to you a little bit about our business. We have a little business that we do, we process people for certain items, you know, these invitations; that's the word I used. Right now I'm in South Carolina on business, you know, some business, I can't get to him until next week, I'm asking as a favor to me, not to Pedro, to me, if you can give him until next week until I get back, saying I promise you—I told him, I will give you my word, I will have that money, or he will have some money for you next week. He says I don't know if I can wait that long, I don't know if I can wait that long. I said well, just understand that it's not him, it's actually my fault. So I started to accept responsibility on behalf of Pedro. He's ready to go, he's got the people ready to go, I am not ready to go. Can we wait until next week? He said well, let me see, let me talk to Pedro, but I'm not going to promise anything, because they're on my back and I'm on his back, and that's the way it is. I said well, do me that favor, if you can. I would appreciate it. And I hung up.

(Tr. 352–53.) On redirect examination, Mercado also described that May 11 conversation with Ceballos—whose first name the agents did not learn until May 19, and whose full name they did not learn until late June—as follows:

I engaged with the defendant Gabriel Ceballos about that Pedro and I have a business that has to do with some invitations and people that come up to see me. I didn't get into the details. He understood that. He acknowledged that he was aware of that and, because of that, we were going to raise some money. The problem we have is I can't meet with him until next week because I'm down here on business. As soon as I get back, he'll bring some people up,

process them, and he'll be able to get some money to you. That's how I was trying to buy the time for him. But the defendant Gabriel Ceballos understood what I was talking about. His issue was the time factor.

(Tr. 480–81.)

Immediately following his conversation with Ceballos, Mercado received a call from Gonzalez, asking whether Ceballos had called. Mercado responded that he had and that Mercado had perhaps bought Gonzalez a week to pay the debt. Mercado testified that this conversation with Gonzalez was interrupted when Gonzalez received a call from Ceballos, who acknowledged having spoken to Mercado. Gonzalez later informed Mercado "that [Ceballos] did give him time, but next week was all he was going to give him— but next week was going to be it." (Tr. 354.)

After learning Ceballos's identity, the agents obtained his telephone records. At trial, records were introduced showing nearly two hundred telephonic contacts between Gonzalez and Ceballos between April 2 and June 14, 2000. No wiretaps had been placed on the telephones of targets of the Operation, however, and the government presented no evidence as to the contents of any of the conversations.

## C. *The Defense Case*

The defense called as its only witness Ceballos's son Sergio, who by then was serving a sentence of five years' to life imprisonment for possession of cocaine as a result of his arrest on June 21, 2000. Sergio testified that when he was arrested, he was driving two people, whose names he did not know, to Albany at the behest of Gonzalez. Gonzalez had called him the night before to make that request and had promised to pay him $200 for that service. Sergio testified that he had not known the

cocaine was in his car and that he had simply received a bag for Gonzalez from a mutual friend.

Sergio testified that he had never engaged in any illegal activity with his father. He had not lived with his father while growing up; and as an adult Sergio had lived with various relatives or with his wife. He saw his father from time to time in a bar they both frequented, and he spoke with his father often on the telephone. Sergio testified that Ceballos was not involved with the cocaine Sergio was carrying on June 21. Sergio was not asked any questions as to whether his father had any involvement in his transport of the aliens.

## D. *The Verdict*

In summation, the government argued that the drug and bribery conspiracies were so interrelated as to be a single conspiracy, though they were charged in two counts because two substantive statutes were involved:

> these two conspiracies, although charged in separate counts because they involve a violation of separate statutes, the two conspiracies are really interconnected, they're woven together. *In some sense they're one conspiracy,* related, but you have to consider them separately for purposes of the indictment . . . .

(Tr. 558 (emphasis added).)

In arguing that Ceballos knew of the bribery conspiracy, the government argued both that his May 11 conversation with Mercado showed such knowledge and that Ceballos had been aware of Ceballos's 1999 inability to pay Euler Soto Gallo, the supplier of 544 grams of heroin who had also been an alien processed in the Operation for a green card:

> [I]t's the green card scheme that really funded the drug transactions in this

case. And it was the attractiveness of the green cards to the brokers, to the people who they solicited which generated large amounts of cash which ultimately ended up in the hands of the sources of supply, sources like Euler, sources like this defendant. You have to ask yourself, did these sources know that the cash was being generated in that fashion. And, clearly, in the case of Euler, he did. I mean, he came up and went through the process himself. But this defendant knew, too, I submit. And the proof of that is in that May 11th conversation. When Mercado tells him, hey, we're going to try and generate a little cash for Pedro, going to try to help him out of his problem, you know, we got this thing going. You recall Investigator Mercado's testimony on that. He said that Ceballos knew what he was talking about. Of course he knew what he was talking about. He knew, because that's how he was getting paid. And that's the reason why he would front such a large quantity of drugs like 70–plus or $78,000 package of heroin to a guy like Pedro Gonzalez. A guy with a pretty bad credit history in the drug game since he stiffed Euler with the 544 grams that Soto Gallo delivered in October.

(Tr. 561–62.) The government argued that the substance of the [May 11] call showed that Ceballos knew about this immigration scheme, he knew how money was being generated and, in fact, the result of it was that he gave Pedro a little more time to pay. And he did that because he was convinced that this was a cash generating machine that he could rely on.

(Tr. 591.)

The jury found Ceballos guilty of both conspiracy to traffic in narcotics and conspiracy to bribe a public official. Ceballos was sentenced principally to a 136–month term of imprisonment for the narcotics conspiracy offense, to be followed by a five-year term of supervised release, and to a 60–month prison term for the bribery conspiracy offense, to be served concurrently with the prison term imposed on the narcotics conspiracy count, and a one-year supervised-release term to be served concurrently with the five-year supervised-release term.

## II. DISCUSSION

On appeal, Ceballos does not challenge his narcotics conspiracy conviction, and he concedes that, as a result of his March 11 conversation with Mercado, he knew of the existence of the bribery conspiracy. But he contends that his conviction of bribery conspiracy should be reversed on the ground that the evidence was insufficient to permit a finding that he joined in or participated in the bribery conspiracy. For the reasons that follow, we agree.

In order to prove a conspiracy in violation of 18 U.S.C. § 371, the government must show that two or more persons entered into an agreement to commit an offense against the United States and that an overt act in furtherance of the conspiracy was committed. *See, e.g., United States v. Desena,* 260 F.3d 150, 154–55 (2d Cir. 2001); *United States v. Monaco,* 194 F.3d 381, 386 (2d Cir.1999), *cert. denied,* 529 U.S. 1028, 120 S.Ct. 1441, 146 L.Ed.2d 329 (2000). In order to convict a given defendant of conspiracy, the government must prove that he knew of the conspiracy and joined it, *see, e.g., Direct Sales Co. v. United States,* 319 U.S. 703, 713, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943); *Desena,* 260 F.3d at 154–55, with the intent to commit the offenses that were its objectives, *see, e.g., Direct Sales Co.,* 319 U.S. at 713, 63 S.Ct. 1265; *United States v. Reyes,* 302 F.3d 48, 53 (2d Cir.2002), that is, with the affirma-

tive intent to make the conspiracy succeed, *see, e.g., United States v. Vargas,* 986 F.2d 35, 39 (2d Cir.), *cert. denied,* 508 U.S. 941, 113 S.Ct. 2417, 124 L.Ed.2d 640 (1993); *United States v. Cianchetti,* 315 F.2d 584, 588 (2d Cir.1963). The agreement that is the gist of conspiracy may be tacit rather than explicit, *see, e.g., Direct Sales Co.,* 319 U.S. at 714, 63 S.Ct. 1265, and "[w]here the existence of a conspiracy has been proved, evidence sufficient to link another defendant with it need not be overwhelming and it may be circumstantial in nature," *Desena,* 260 F.3d at 154 (internal quotation marks omitted).

█ However, "knowledge of the existence and goals of a conspiracy does not of itself make one a coconspirator." *Cianchetti,* 315 F.2d at 588; *see, e.g., Direct Sales Co.,* 319 U.S. at 711, 63 S.Ct. 1265; *Desena,* 260 F.3d at 154; *United States v. Casamento,* 887 F.2d 1141, 1167 (2d Cir. 1989). "There must be something more than [m]ere knowledge, approval of or acquiescence in the object or the purpose of the conspiracy," *Cianchetti,* 315 F.2d at 588 (internal quotation marks omitted); the defendant's "attitude towards the forbidden undertaking must be more positive. . . . he must in some sense promote their venture himself, make it his own, have a stake in its outcome," *id.* (internal quotation marks omitted), or make "an affirmative attempt to further its purposes," *id.; see, e.g., Direct Sales Co.,* 319 U.S. at 713, 63 S.Ct. 1265 (the evidence must show that "[t]here is . . . more than knowledge," that "[t]here is informed and interested cooperation"). "Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal." *Id.* at 711, 63 S.Ct. 1265.

█ Where the conspiracy involves a specific-intent crime, "the government [must] establish beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute." *United States v. Samaria,* 239 F.3d 228, 234 (2d Cir.2001). The bribery that was the objective of the conspiracy at issue on the present appeal is a specific-intent crime, as the statute prohibits a person "directly or indirectly, [from] corruptly giv[ing], . . . anything of value to any public official . . . with intent . . . to influence any official act." 18 U.S.C. § 201(b)(1)(A). *See generally United States v. Sun–Diamond Growers of California,* 526 U.S. 398, 404–05, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999) ("for bribery [in violation of § 201(b)(1)(A) ] there must be a . . . specific intent to give or receive something of value in exchange for an official act" (emphasis omitted)).

█ A defendant challenging the sufficiency of the evidence to support his conviction bears "a heavy burden." *United States v. Best,* 219 F.3d 192, 200 (2d Cir. 2000), *cert. denied,* 532 U.S. 1007, 121 S.Ct. 1733, 149 L.Ed.2d 658 (2001). In reviewing such a challenge, we must credit every inference that could have been drawn in the government's favor, *see, e.g., United States v. Carson,* 702 F.2d 351, 361 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983), and defer "to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence," *United States v. Morrison,* 153 F.3d 34, 49 (2d Cir.1998). We must affirm the conviction if, viewing the evidence in the light most favorable to the prosecution, we conclude that, from the inferences reasonably drawn, " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,' " *Best,* 219 F.3d at 200 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)) (emphasis in *Jackson* ).

Nonetheless, the jury's inferences must be based on evidence and must be reasonable. *See generally Goldhirsh Group, Inc. v. Alpert,* 107 F.3d 105, 108 (2d Cir.1997) ("The jury's role as the finder of fact does not entitle it to return a verdict based only on confusion[ or] speculation . . .; its verdict must be reasonably based on evidence presented at trial." (internal quotation marks omitted)). Thus, we have reversed conspiracy convictions for lack of evidence that a given defendant intended to join the conspiracy where, for example, the defendant agreed to act as a drug courier if certain conditions were met, but ultimately stated that he would not participate, *see Casamento,* 887 F.2d at 1167; or where the defendant initially acknowledged that he was able to supply drugs, but was reluctant to do so, and later "unequivocally disassociated himself from the venture" and stated "that he 'wanted nothing to do with it,'" *United States v. Steinberg,* 525 F.2d 1126, 1134 (2d Cir. 1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); or where the defendant had stated that he might be able to help arrange for the receipt and distribution of narcotics, but was never heard from again, *see Cianchetti,* 315 F.2d at 587–88. Where the evidence at trial was insufficient to convict the defendant, the judgment of conviction must be reversed and the indictment dismissed. *See, e.g., Burks v. United States,* 437 U.S. 1, 18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

The government suggests on this appeal, as it did at trial, that Ceballos knew about the bribery conspiracy prior to his May 11 conversation with Mercado, arguing that this was "evidenced by the fact that [Ceballos] 'fronted' such large amounts of narcotics to the agents through Gonzalez without immediate payment," referring in part to the evidence that on March 22, Ceballos had "supplied a $75,000 kilogram of heroin." (Government brief on appeal at 15.)

Similarly, in its summation to the jury, the government argued that the evidence revealed that Ceballos knew of the bribery conspiracy prior to the May 11 conversation because

> Mercado[ in his] testimony . . . . said that Ceballos knew what he was talking about. Of course he knew what he was talking about. *He knew, because that's how he was getting paid. And that's the reason why he would front such a large quantity of drugs like 70–plus or $78,000 package of heroin to a guy like Pedro Gonzalez.* A guy with a pretty bad credit history in the drug game since he stiffed Euler with the 544 grams that Soto Gallo delivered in October.

(Tr. 562 (emphasis added).) We have several difficulties with these arguments.

First, Mercado did not testify that Ceballos already "knew" what Mercado was telling him on May 11. Rather, Mercado's testimony, on redirect examination, was that Mercado explained the business he had with Gonzalez and that "Ceballos *understood* what I was talking about." (Tr. 480–81 (emphasis added).)

Second, the government's inference that Ceballos understood, prior to the May 11 conversation, the workings of the green-card-processing business, is not based on Mercado's testimonial description of Ceballos's statements. As can be seen from Mercado's testimony, quoted in Part I.B. above, the only actual statements attributed to Ceballos by Mercado were as follows: (a) in response to Mercado's identification of himself as Danilo, the friend that Gonzalez wanted Ceballos to call, "He said yes, that's why I'm calling"; (b) in response to Mercado's statement that, as a result of the business Mercado had with Gonzalez of processing people for certain items, Gonzalez would have some money

for Ceballos next week, "He says I don't know if I can wait that long, I don't know if I can wait that long"; and (c) in response to Mercado's importuning Ceballos to wait a week, "He said well, let me see, let me talk to Pedro, but I'm not going to promise anything, because they're on my back and I'm on his back, and that's the way it is." (Tr. 352–53.) No other statements were attributed to Ceballos.

Mercado's testimony inferring that "Ceballos understood what I was talking about" (Tr. 480–81) must be read in light of his testimony that, at the very beginning of the May 11 conversation, Mercado had explained his green-card-processing business to Ceballos: "I told him, I would like to explain to you a little bit about [my] business [with Gonzalez]" (Tr. 352), telling him, "We have a little business that we do, we process people for certain items, you know, these invitations; that's the word I used." (Id.; see also Tr. 480 ("I received the call ... from Gabriel Ceballos. At that time I identify myself as to who I am, [and] he ... recognized who I was talking on behalf of, which is Pedro Gonzalez, and his situation with him, Gabriel Ceballos, and I offered to help in a way that I could. And I started to explain that.").) Mercado did not testify that Ceballos understood anything about the green-card-processing business prior to Mercado's explanations.

In sum, Mercado did not testify to any statements by Ceballos that indicated Ceballos had already known of the green-card-processing business prior to hearing Mercado's explanation. Mercado's testimony was that he explained, and Ceballos understood.

■ The government argues that Ceballos already "knew" of the bribery conspiracy "because that's how he was getting paid" (Tr. 562; Government brief on appeal at 15 ("The jury easily could conclude that Ceballos supplied such large amounts of drugs to the agents with the full knowledge and expectation that the bribery of the public official would generate the money to pay for the drugs.")). These arguments are not supported by the proof. First, there was no evidence that Ceballos knew that part of the money he had received for his drugs prior to May 11 came from aliens who were obtaining fraudulent green cards. Although the government's summation referred to "sources like Euler [Soto Gallo], sources like this defendant" (Tr. 561), the comparison was inapt. Euler Soto Gallo knew of the bribery conspiracy because he was brought by Gonzalez to the agents to obtain a green card and was the supplier of the narcotics for which that green-card processing was partial payment. And thereafter eliminating Gonzalez as the middleman for these transactions, Euler Soto Gallo himself brought the agents narcotics and other aliens for green-card processing. Ceballos, in contrast, was not an alien processed by Operation Wild Card for a green card; as the government acknowledged in summation, Ceballos was a naturalized United States citizen. And Ceballos never brought the agents any aliens for processing. Thus, Ceballos, except for the fact that he was a drug supplier, was not shown to be at all like Euler Soto Gallo.

Moreover, Mercado did not testify that he told Ceballos on May 11 that this green-card-processing business had generated the payments to Ceballos in the past. Mercado testified that he informed Ceballos, "that Pedro and I have a business" having to do with people and documents "and, because of that, we were *going to raise* some money." (Tr. 480 (emphasis added).) Mercado's trial testimony did not include mention of any statement to Ceballos that the agents had in the past routinely paid Gonzalez for drugs through the processing of aliens.

Although the government also points to the fact that there were nearly two hundred telephone contacts between Gonzalez and Ceballos between April 2 and June 14, 2000, it presented no evidence as to the contents of those conversations. It is a given that Gonzalez was obtaining narcotics from Ceballos, which obviously necessitated conversations. But any suggestion that those telephone conversations also included discussions of bribing an INS official to process illegal aliens for green cards is wholly speculative.

The government argues that Ceballos "gave drugs to the agents and relied on the future bribery of the public official to get paid." (Government brief on appeal at 15.) This argument is factually flawed and, in the absence of proof, unreasonable. In fact, Ceballos did not sell the narcotics to the agents; he sold drugs to Gonzalez, who resold them—at a hefty profit—to the agents. The agents had no transactions with Ceballos, and indeed had no communication with him other than Mercado's telephone conversation with him on May 11.

Further, the suggestion that Ceballos "relied on" the green-card-processing business for payment is simply not reasonable, given the evidence of record. Although the government contends that an inference of Ceballos's reliance is supported by "Mercado's testimony that the quantities of drugs he purchased from Gonzalez were larger than he had ever purchased before, and that he was only able to make these purchases because he could use the green cards to pay for the drugs" (Government brief on appeal at 15), that contention suffers from at least two flaws. First, while Mercado's testimony that he could not afford to buy the drugs with cash reflected the knowledge of the agents, there was no evidence whatever that anyone shared this knowledge with Ceballos. Second, the agents' inability to pay for the drugs without using green-card processing as currency was a consequence of the fact that they were not really drug dealers—a fact that clearly was not known by Ceballos. Real drug dealers resell their drugs. Without any evidence of reliance, it is not reasonable to surmise that Ceballos was relying on the green-card-processing business to bring him a payment of $58,000 for heroin that could have a resale street value of several million dollars.

Finally, the government argues that Ceballos's knowledge of the bribery conspiracy was the only possible explanation for his willingness to "'front[ ]' such large amounts of narcotics" (Government brief on appeal at 15), especially "to a guy like Pedro Gonzalez[, a] guy with a pretty bad credit history in the drug game since he stiffed Euler with the 544 grams that Soto Gallo delivered in October" (Tr. 562). But we have seen no evidence that Gonzalez was generally perceived by drug suppliers as a bad credit risk, nor any evidence that Ceballos was ever aware of the October 1999 dealings between Gonzalez and Euler Soto Gallo.

In sum, the government's suggestion that Ceballos knew of and relied on the bribery conspiracy prior to Mercado's explanation of it in the May 11 conversation is unsupported by the evidence.

Mercado's testimony as to his May 11 conversation with Ceballos was of course sufficient to show Ceballos's knowledge from that time forward as a result of that conversation. But as discussed above, a defendant may not be convicted of conspiracy merely because he knows of, approves of, or acquiesces in the objective of a conspiracy. There must be proof that he intended to join the conspiracy, that is, that he participated in it, or in some way made an affirmative attempt to further the conspiracy's purposes, or made it his own

venture in the sense of having a stake in its outcome. Such proof was lacking here.

Mercado testified that when he asked Ceballos to give Gonzalez another week to pay the drug debt, Ceballos said he was "not going to promise anything." (Tr. 353.) Although Ceballos thereafter stated to Gonzalez that he would allow Gonzalez another week to pay, his mere forbearance from insisting on immediate payment did not make it reasonable to infer that he thereby joined the bribery conspiracy. There was no indication that Ceballos performed any act in order to facilitate, or any act that could have had the effect of facilitating, the processing of additional aliens in the following week. Ceballos's mere patience did nothing whatever to further the bribery conspiracy.

■ The government argues that Ceballos *participated* in the bribery conspiracy because knowing of its existence and its unlawful aims, he [1] accepted payments for the narcotics he supplied which were generated through the bribery of the official, and [2] further supplied Gonzalez with drugs that were intended to be used to purchase the green cards through bribery of the INS official.

(Government brief on appeal at 12 (emphasis in original).) We have difficulty with the legal premise of the first part of this argument and with the factual premise of the second part.

The government cites no authority for the proposition that a defendant's mere receipt of payment on a preexisting debt in one unlawful business with knowledge of the fact that the money was generated by a different unlawful enterprise is sufficient to permit an inference that the defendant joined the second enterprise, and we are aware of none. To the contrary, acquiescence by itself is not sufficient. And although the government argues that

Ceballos's knowledge that Gonzalez would receive money from the green-card-processing business, with which he could pay Ceballos, gave Ceballos a "stake" in the bribery conspiracy, we think that is too broad an interpretation of that concept. Plainly, Ceballos wanted his money from Gonzalez; and he likely hoped that the green-card-processing business would generate the cash for Gonzalez to pay him the following week. But he had no "stake" in that business comparable to that of the defendant in, for example, *United States v. Rush,* 666 F.2d 10, 11 (2d Cir.1981), who lent drug importers $25,000 that was to be repaid with an exorbitant $15,000 in interest, or comparable to the defendant in *Direct Sales Co.,* whose "stake," the Supreme Court noted, "was in making the profits which it knew could come *only* from its encouragement of [its buyer's] illicit operations." 319 U.S. at 713, 63 S.Ct. 1265 (emphasis added). Ceballos was not shown prior to May 11 to have advanced drugs with any knowledge of the bribery conspiracy; and he plainly did not agree to forgo payment for the drugs if Gonzalez could not get additional aliens processed the following week. As discussed, for $58,000, Ceballos had sold Gonzalez heroin that, according to Delgado, would have a street value of at least $800,000 and perhaps more than $3 million. The record clearly shows that Ceballos expected to be paid irrespective of whether any further aliens were processed.

■ As to the government's factual argument that Ceballos, after his May 11 conversation with Mercado, "supplied Gonzalez with drugs *that were intended* to be used to purchase the green cards through bribery of the INS official" (Government brief on appeal at 12 (emphasis added)), the record shows that Gonzalez had such an intent but is bereft of evidence as to

any such intent on the part of Ceballos. The government argues that it could reasonably be inferred that Ceballos joined the bribery conspiracy because in late May or June he "was prepared to deliver fourteen kilograms of cocaine valued at $25,000 per kilogram or in total, $350,000," again "'front[ing]'" the drugs "with the full knowledge and expectation" that he would be paid from the proceeds of the green-card-processing business. (Government brief on appeal at 15.) Again, although Gonzalez may have had an expectation that the planned June deliveries were to be paid for through the green-card-processing business, the argument that Ceballos too had such an expectation is speculation. The government did not introduce any evidence of such an agreement between Gonzalez and Ceballos. And since there were no post-May 11 deals that resulted in any completed drug deliveries to the agents— the first planned delivery being cancelled because police surveillance was suspected, and the second being thwarted by the arrest of Sergio and seizure of the cocaine— there obviously was no evidence of post-delivery conduct by Ceballos from which an actual agreement to link payment with the processing of aliens might have been inferred.

 Finally, the government argues that evidence of Ceballos's membership in the bribery conspiracy is to be found in the actions of Sergio:

> Because Sergio was transporting the four kilograms of cocaine on his father's behalf, a rational jury could conclude that he also was transporting the aliens in furtherance of the bribery conspiracy on his father's behalf.

(Government brief on appeal at 15–16.) But Sergio testified that he was transporting the aliens at the request of Gonzalez, for which he was to be paid by Gonzalez; and the government did not ask him any questions as to any connection between the aliens and Ceballos. Further, the government had presented evidence of several telephonic contacts between Sergio and Gonzalez in the days shortly before Sergio's June 21 transport of aliens; and although the government questioned Sergio about certain telephone conversations he had had with his father in early June, it presented no evidence of any conversation between father and son near the June 21 date on which Sergio transported aliens. There was thus no evidence that Ceballos had asked his son to help transport aliens.

In sum, we see in the record no evidence from which the jury could reasonably have inferred that Ceballos learned of the bribery conspiracy prior to May 11, 2000, or that having learned of it on that date, he participated in or intended to join it thereafter. The fact that two conspiracies are interconnected does not mean that all members of one are thereby members of the other. (For example, except for Euler Soto Gallo and one other defendant who was also a drug supplier, the aliens who were processed for green cards were not alleged to be members of the drug conspiracy.) The jury may have been confused by the government's statement in summation that, although the indictment charged two conspiracies that must be considered separately, "the two conspiracies are really interconnected, they're woven together. *In some sense, they're one conspiracy*" (Tr. 558 (emphasis added)), and/or by the trial judge's overview of the law at the beginning of his instructions, which adverted to the drug-conspiracy count and the bribery conspiracy count in tandem, and stated that the government alleged "two separate conspiracies *which may be intertwined*," and that "it's up to you to decide if those conspiracies existed, and if the defendant willfully and knowingly became

a member *of either* of these conspiracies." (Tr. 595 (emphases added).)

The court's later instructions stated, with respect to the bribery conspiracy, that in order to convict Ceballos on that count the jury must find beyond a reasonable doubt that he "willfully became a member of the conspiracy charged" (Tr. 627), and the instructions as a whole appear to be correct. Nonetheless, the evidence that Ceballos intended to join the bribery conspiracy was legally insufficient, and the jury's finding of guilt in the absence of evidence of that intent may be explainable by confusion from the government's emphasis that the two conspiracies merged into one and from the court's preliminary reference to the possibility that the conspiracies were "intertwined" and that it was up to the jury to determine whether Ceballos intended to join "either." (Tr. 595.)

For the reasons discussed above, we conclude that the evidence was insufficient to permit a rational juror to infer that Ceballos joined the bribery conspiracy. Accordingly, his conviction of that offense must be reversed and that count of the indictment dismissed.

In imposing sentence on Ceballos for his narcotics conspiracy offense, the district court sentenced Ceballos to a prison term in the middle of the range prescribed by the Sentencing Guidelines. Although the bribery conspiracy conviction had not increased Ceballos's Guidelines range, it is possible that the district court's conclusion that Ceballos should not be sentenced at the bottom of that range may have been influenced by the fact that Ceballos was also convicted of bribery conspiracy. We thus remand not only for entry of an amended judgment dismissing the bribery conspiracy count, but also for the district court to consider whether dismissal of that count warrants reconsideration of the sentence imposed on the narcotics conspiracy count.

## CONCLUSION

We have considered all of the government's arguments in support of the bribery conspiracy conviction and have found them to be without merit. So much of the judgment as reflects that conviction is reversed. The matter is remanded for entry of an amended judgment dismissing that count and for consideration by the district court of whether resentencing on the remaining count is warranted.